## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| THOMAS J. BRYANT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil No.   13-cv-309-CJP[1] |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Thomas J. Bryant is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying him Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).

## Procedural History

Plaintiff applied for DIB in August, 2009, and for SSI in October, 20009.   In both applications, he alleged disability beginning on July 30, 2009.   (Tr. 21). After holding an evidentiary hearing, Administrative Law Judge (ALJ) William L. Hafer denied the applications in a decision dated January 31, 2012.   (Tr. 21-31). Plaintiff's request for review was denied by the Appeals Council, and the January

---

[1]  This case was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c).   See, Doc. 23.

31, 2012, decision became the final agency decision.   (Tr. 1).

Plaintiff has exhausted his administrative remedies and has filed a timely complaint in this court.

### Issues Raised by Plaintiff

Plaintiff raises the following issues:

1.   The ALJ erred in not giving greater weight to the opinions of his treating orthopedic surgeon, Dr. Kovalsky.

2.   The ALJ's assessment of plaintiff's residual functional capacity was erroneous in that the ALJ concluded that plaintiff could occasionally lift 20 pounds and the ALJ failed to account for Dr. Kovalsky's opinion on ability to balance and the side effects of plaintiff's medications.

3.   The credibility determination was erroneous.

### Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2]   For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).**   A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or

---

[2]  The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   For all intents and purposes relevant to this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.   Most citations herein are to the DIB regulations out of convenience.

psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.   **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work.  If the applicant can engage in other work, he is not disabled.

***Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the

claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.   **20 C.F.R. §§ 404.1520;** *Simila v. Astrue***, 573 F.3d 503, 512-513 (7th Cir. 2009);** *Schroeter v. Sullivan***, 977 F.2d 391, 393 (7th Cir. 1992).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.   If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Secretary at step five to show that the claimant can perform some other job.   *Rhoderick v. Heckler***, 737 F.2d 714, 715 (7th Cir. 1984).   See also,** *Zurawski v. Halter***, 245 F.3d 881, 886 (7th Cir. 2001)**(Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to understand that the scope of judicial review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**.   Thus, this Court must determine not whether Mr. Bryant was, in fact, disabled, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were

made.   See, *Books v. Chater*, **91 F.3d 972, 977-78 (7th Cir. 1996)** (citing *Diaz v. Chater*, **55 F.3d 300, 306 (7ᵗʰ Cir. 1995)**).   This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, **402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   *Brewer v. Chater*, **103 F.3d 1384, 1390 (7ᵗʰ Cir. 1997)**.   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   See, *Parker v. Astrue*, **597 F.3d 920, 921 (7ᵗʰ Cir. 2010), and cases cited therein.**

### The Decision of the ALJ

ALJ Hafer followed the five-step analytical framework described above.   He determined that Mr. Bryant had not been engaged in substantial gainful activity since the alleged onset date.   The ALJ found that plaintiff had severe impairments of degenerative disc disease of the lumbar spine with L5-S1 fusion and sciatica, and that his impairments do not meet or equal a listed impairment.

ALJ Hafer concluded that Mr. Bryant had the residual functional capacity to perform work at the sedentary exertional level, with limitations.[3]

---

[3] The ALJ stated that he found that plaintiff was limited to sedentary work, but he then stated that plaintiff could lift 10

Based on the testimony of a vocational expert (VE), he determined that plaintiff could not do his past work, but he could perform other jobs which exist in significant numbers in the national and local economy.   (Tr. 21-31).

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff.

### 1.   Prior Decision

Mr. Bryant initially applied for disability benefits in July, 2006.   In a decision dated August 3, 2009, an ALJ found that Mr. Bryant was disabled from June 15, 2005, through May 8, 2008.   His disability resulted from post-laminectomy and post-fusion syndrome.   He underwent a laminectomy and fusion at L5-S1 in August, 2005.   His back pain persisted, and Dr. Kovalsky recommended surgical implantation of a dorsal column stimulator.   This was done in August, 2007.   The ALJ concluded that Mr. Bryant experienced medical improvement such that, as of May 9, 2008, he was able to do work at the sedentary exertional level, limited to no repetitive bending, lifting or twisting.   (Tr. 64-79).

### 2.   Workers' Compensation Claim

Plaintiff made a workers' compensation claim for a back injury which occurred on December 1, 2004.   The claim was settled in December, 2008, for a

---

pounds frequently and 20 pounds occasionally, which are above the lifting limits of sedentary work.   However, as the hypothetical question posed to the VE assumed sedentary work, this discrepancy is not significant.

total of $180,000.00   (Tr. 135-138).

**3.**   **Agency Forms**

Plaintiff was born in September, 1962, and was 47 years old on the alleged onset date.   (Tr. 158).   He was insured for DIB through December 31, 2013.   (Tr. 158).   Defendant acknowledges that the ALJ mistakenly found that he was insured for DIB only through June 30, 2011.   See, Doc. 26, p. 1 n. 1.

Mr. Bryant said he was unable to work because he had a fused back with screws and rods and a spinal stimulator, and suffered from sciatica.   He said he could only lift 10 pounds occasionally, with no repetitive bending, lifting or twisting, and was limited to 2 hours of standing/walking a day.   (Tr. 162).   These were restrictions placed on him by his doctor in October, 2009.   (Tr. 182).

He had worked in the past as a builder in a boat factory, a carpenter, and a laborer.   (Tr. 163).

In April. 2010, Mr. Bryant submitted a Function Report in which he said that he was able to do very little.   He lived with his wife and children.   He said that he could only sleep for about 2 hours at a time.   His wife and children did most of the house and yard work.   He went shopping with his wife about twice a month.   He could not sit or stand for very long,   He had back pain, numbness in his leg and muscle spasms in his back.   He could walk only 100 yards.   Reaching overhead caused the battery in his stimulator to go off and shock him.   He had to take rest periods during the day because he did not sleep well at night.   (Tr. 207-220).

**4.** **Evidentiary Hearing**

Plaintiff was represented by counsel at the hearing on October 14, 2011. (Tr. 38).

Plaintiff was six feet tall and weighed about 200 pounds.   (Tr. 42).

Mr. Bryant testified that the nerve stimulator was implanted in 2007.   It did not work.   He had an appointment with Dr. Kovalsky to do a procedure to deaden his sciatic nerve.   (Tr. 43).   He said that the wires that come out of the stimulator were between his shoulder blades, and, when he raised his hands or reached out to grab something, "it makes the stimulator shock you like touching an electric fence." (Tr. 43-44).   He turned the stimulator off at night because he could not lay flat with it on.   (Tr. 43-44).   He talked to the Medtronic people who came to his doctor's office to reprogram the stimulator, and they said "it's just normal that . . . ."   (Tr. 51-52).

He could sit for 45 minutes to an hour if he did not take any pain medication. If he took his medication, he could sit for about 3 hours.   He took Norco, Lyrica and Flexeril.   He only took Lyrica and Flexeril at night because they made him drowsy.   (Tr. 45).

Dr. Kovalsky prescribed a cane in May, 2011, after plaintiff fell.   Plaintiff testified that he always used a cane, even in the house.   (Tr. 47-48).

Mr. Bryant testified that he did not do much.   He went to his children's ball games, but he sat in his car, and not in the bleachers.   (Tr. 49).

At one point, plaintiff asked Dr. Kovalsky to increase his weight limit to 50

pounds so he could try to go back to work at the boat factory.   He "tried to work and couldn't do it."   (Tr. 54).

Plaintiff testified that he had numbness down his right leg.   (Tr. 54-55). Bending from the waist, twisting and reaching caused him pain where the hardware was located.   (Tr. 57).   After he took his medication, he slept in a recliner for an hour to an hour and a half.   (Tr. 57-58).

A vocational expert (VE) also testified.   The ALJ asked the VE to assume a person who was able to frequently lift 5 pounds and occasionally lift 10 pounds, with the following limitations:

- Able to sit for 6 hours total, with the opportunity to stand for 2 to 3 minutes after each hour of sitting;

- Limited to a total of 2 hours of standing/walking per day;

- Only occasional stooping, kneeling, crouching, crawling and climbing stairs;

- No climbing of ladders, ropes or scaffolding;

- No work at unprotected heights or around dangerous machinery.

(Tr. 59).

The VE testified that this hypothetical person could do jobs which exist in significant numbers, such as sedentary hand packer and production work assembler.   (Tr. 59-60).   The person could still do these jobs if he required a cane to walk.   However, if he were limited to only occasional handling, fingering and feeling objects, all unskilled sedentary work would be precluded.   (Tr. 60).

9

If he were limited to 4 hours of sitting, 2 hours of standing and 2 hours of walking per day, he would be unable to perform any unskilled sedentary jobs.   (Tr. 60-61).

**5.**   **Medical Records**

After Mr. Bryant hurt his back at work, he underwent fusion surgery.   The surgery was not done by Dr. Kovalsky.   In 2007, Dr. Kovalsky implanted a dorsal column stimulator.   In May, 2009, Dr. Kovalsky described the prior surgery as "failed lumbar interbody surgery with residual radicular right leg pain."   Dr. Kovalsky did not feel that he was a candidate for revision of surgery.   He noted that the stimulator was working, but was not completely relieving his right leg pain. Mr. Bryant had attempted to return to his job at a boat factory, but the repetitive standing, walking and bending aggravated his symptoms.   Dr. Kovalsky encouraged him to pursue some kind of job training so that he could "use his brain and not have to do physical activity."   (Tr. 463).

In October, 2009, plaintiff reported to Dr. Kovalsky that the dorsal column stimulator was not working as well as it had been, and his symptoms had significantly changed in the past 2 months.   He was having increased lower back spasms and pain in his right leg.   He had "problems lifting things out of the refrigerator."   Standing and walking for more than an hour caused him "significant symptomatology."   A Medtronic representative had tried to adjust the stimulator, but he was not able to reprogram it to give Mr. Bryant any better results.   On exam, he had mildly positive straight leg raising on the right.   He was grossly intact neurologically and had no local pain in his incisions.   X-rays showed the paddle

10

lead of the stimulator to be in position.   Dr. Kovalsky felt there was nothing he could do to help Mr. Bryant.   He gave him new restrictions of 10 pounds maximum for occasional lifting, and only sedentary work with no repetitive bending, lifting or twisting, and no standing or walking for more than 2 hours.   He noted that plaintiff had no insurance, and they were going to try to keep his office visits to a minimum. (Tr. 478).

In December 2009, Mr. Bryant called Kr. Kovalsky's office and asked for a note with his current restrictions, except with "sedentary duty removed," to help him get disability.   (Tr. 479).

In June, 2010, Mr. Bryant complained of increased symptoms in his right leg and numbness in his right thigh.   On exam, he had possible decreased sensation to light touch in the thigh.   He was neurovascularly intact with normal strength, and normal sensation in the right foot.   Dr. Kovalsky ordered a CT scan.   (Tr. 500).

Plaintiff returned to Dr. Kovalsky in August, 2010.   The doctor noted that the CT scan showed well-positioned pedicle screws and a solid fusion at L5-S1, with no disc abnormalities above L5.   The L5 and S1 nerve roots did not appear to be compressed.   Dr. Kovalsky concluded that he had "no new problems."   He noted that the dorsal stimulator was not working as well as it had been, and attempts to reprogram it had not helped.   Dr. Kovalsky had nothing else to offer him, except to manage his pain.   He was to continue on a 10 pound lifting restriction.   (Tr. 498).

In October, 2010, Dr. Kovalsky increased his Norco dosage and continued

him on Flexeril.   (Tr. 496).

Mr. Bryant was seen by a physician's assistant in Dr. Kovalsky's office in May of 2011.   He was still having the same problems.   On exam, he had mild pain to palpation from L3 to L5.   He had no pain in his SI joints or buttocks.   Straight leg raising was positive on the right.   He reported no side effects from his medications. He was continued on the same medications.   (Tr. 512).

Mr. Bryant was seen by Dr. Kovalsky in July, 2011.   He reported that he had increased right buttock pain, numbness and tingling in his calf, and swelling in his right calf.   The tingling in his foot was increasing and he was having pain from his heel to his buttocks.   He had tried working part-time with a farmer harvesting wheat.   He was driving the truck, but was only able to sit for 30 or 40 minutes.   He was only able to sit for 30 minutes in the bleachers at his kids' ballgames.   On exam, straight leg raising was positive on the right.   His right calf was 1 and ½ cm larger than the left.   He had mildly positive bowstring test on the right.   Dr. Kovalsky felt he had a mild increase in his radicular leg pain, and there may be a minor element of reflex sympathetic dysfunction causing abnormal vascular return. He added Lyrica to his current Vicodin and Flexeril.   Dr. Kovalsky again noted he had no insurance.   (Tr. 518).

Dr. Kovalsky filled out a work restriction slip on July 8, 2011, indicating plaintiff could lift 10 pounds maximum, with no bending, lifting, or twisting, and no more than 2 hours of standing/walking.   (Tr. 520).

Mr. Bryant returned to Dr. Kovalsky in October, 2011, with increased right

leg pain and intermittent swelling and burning sensation.   The clinical impression was mild reflex sympathetic dysfunction or dystrophy.   He had gotten on Medicaid. Dr. Kovalsky referred him for a lumbar sympathetic block.   (Tr. 533).

A lumbar sympathetic block was performed by Dr. Michael Templer on October 17, 2011.   (Tr. 524).   A few days later, Dr. Templer noted that the injection did not relieve plaintiff's pain at all, and he had nothing further to offer him.  (Tr. 521).

**6.**     **Dr. Kovalsky's Opinion**

In November, 2010, Dr. Kovalsky filled out a form submitted to him by the agency in which he assessed Mr. Bryant's ability to do a number of work-related activities.   He opined that plaintiff could occasionally lift 10 pounds, sit for a total of 6 hours, and stand/walk for a total of 2 hours.   He must be able to shift position at will, and would require 1 or 2 unscheduled breaks a day.   He was limited to only occasional overhead reaching and push/pull on both sides, and to only frequent reaching in all directions.   Dr. Kovalsky wrote that "reaching overhead or pushing + pulling will aggravate low back pain."   He could never climb ladders or scaffolds, balance, kneel, crouch or crawl, and could only occasionally climb stairs and ramps and stoop. (Tr. 505-510).

**7.**     **Consultative Examination**

There were no consultative physical examinations.

**8.**     **State Agency RFC Assessments**

Based upon a review of the medical records, a state agency physician rated his physical RFC in January, 2010.   She opined that plaintiff could sedentary work (occasional lifting of 10 pounds, frequent lifting of less than 10 pounds, standing/walking for at least 2 hours a day, sitting for 6 hours a day), with postural limitations, but no limitations in reaching, handling, fingering or feeling.   (Tr. 481-488).

**9.**     **Records Not Before the ALJ**

After the ALJ issued his decision, plaintiff submitted additional medical records to the Appeals Council in connection with his request for review.   See, AC Exhibits List, Tr. 5.   Thus, the medical records at Tr. 535-602, designated by the Appeals Council as Exhibits 16F and 17F, were not before the ALJ.

The medical records at Tr. 535-602 cannot be considered by this Court in determining whether the ALJ's decision was supported by substantial evidence. Records "submitted for the first time to the Appeals Council, though technically a part of the administrative record, cannot be used as a basis for a finding of reversible error."   ***Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994).**   See also, ***Getch v. Astrue*, 539 F.3d 473, 484 (7th Cir. 2008); *Rice v. Barnhart*, 384 F.3d 363, 366, n. 2 (7th Cir. 2004).**

**Analysis**

The Court turns first to plaintiff's challenge to the ALJ's credibility findings. As ALJ Hafer emphasized, "the claimant's credibility is a major issue in this case."

(Tr. 27).

Plaintiff argues that the ALJ erred in his credibility determination because he used boilerplate language that has been criticized by the Seventh Circuit Court of Appeals, and the reasons he gave for disbelieving plaintiff were not supported by the record.

The credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. **Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)**. Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." **Schmidt v. Barnhart, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.**

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at *3.

It is true that ALJ Hafer used the boilerplate language that was criticized in cases such as **Bjornson v. Astrue, 671 F.3d 640, 644-645 (7th Cir. 2012)**, and

*Parker v. Astrue*, 597 F.3d 920, 921-922 (7th Cir. 2010).   However, the use of the boilerplate language does not automatically require reversal.   It is harmless where the ALJ goes on to support his conclusion with reasons derived from the evidence.   See, *Shideler v. Astrue*, 688 F.3d 306, 310-311 (7th Cir. 2012); *Richison v. Astrue*, 462 Fed. Appx. 622, 625-626 (7th Cir. 2012).

The ALJ is required to give "specific reasons" for his credibility findings. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).   It is not enough just to describe the plaintiff's testimony; the ALJ must analyze the evidence.   *Ibid*.   See also, *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009)(The ALJ "must justify the credibility finding with specific reasons supported by the record.")   If the adverse credibility finding is premised on inconsistencies between plaintiff's statements and other evidence in the record, the ALJ must identify and explain those inconsistencies.   *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

Here, the reasons given by the ALJ for rejecting plaintiff's statements are not supported by the record and are not valid.

The ALJ highlighted the fact that Mr. Bryant asked Dr. Kovalsky for a letter stating he could not work.   This is not a valid reason to question plaintiff's credibility.   "The claimant bears the burden of submitting medical evidence establishing her impairments and her residual functional capacity. . . . How else can she carry this burden other than by asking her doctor to weigh in? Yet rather than forcing the ALJ to wade through a morass of medical records, why not ask the

16

doctor to lay out in plain language exactly what it is that the claimant's condition prevents her from doing?"  **_Punzio v. Astrue_, 630 F.3d 704, 712 (7th Cir. 2011).**

Citing to Dr. Kovalsky's records, the ALJ observed that Mr. Bryant "was looking for [a] part time job as a wheat farmer helper."   He went on to say that he suspected that "little if any farm work" is performed at the sedentary level.   (Tr. 26).   This is a misstatement of the record.   Dr. Kovalsky's records state that plaintiff had tried working with a farmer harvesting wheat, but "he was driving the truck, and he couldn't sit for more than 30 or 40 minutes because he was getting increased right buttocks and leg pain."   (Tr. 518).

The ALJ pointed out that plaintiff had tried to return to his job at the boat factory, "but was unable to lift fifty pounds."   He then went on to draw the illogical conclusion that "even though his ability to lift fifty pounds was temporary, it suggests the absence of a disabling degree of impairment."   (Tr. 26).

The ALJ misunderstood the record regarding the efficacy of the spinal cord stimulator.   He suggested that plaintiff's claim that the spinal cord stimulator worked only intermittently was contradicted by the fact that "the user guide shows that it works." (Tr. 27).   However, as the Commissioner concedes in her brief, "the user guide did not speak to the stimulator's efficacy."   See, Doc. 26, p. 13.   The ALJ also made the puzzling remark that "I find it ironic that that there has been no attempt to remove or repair his spinal cord stimulator."   (Tr. 27).   The

Commissioner tacitly concedes that this remark is "somewhat unclear."  See, Doc. 26, p. 16.  In fact, again, this is a misstatement of the record in that Dr. Kovalsky's notes indicate that a Medtronic representative tried several times to adjust the stimulator.

Lastly, the ALJ felt that plaintiff's daily activities indicated that he could do sedentary work.  His activities consisted of helping his wife get the kids off to school in the morning, caring for dogs with the help of his children, spending time with his children, walking, driving a car, shopping and attending church services. (Tr. 27).   However, these sporadic activities do not add up to an ability to sustain full time work.  This is an example "of a problem we have long bemoaned, in which administrative law judges have equated the ability to engage in some activities with an ability to work full-time, without a recognition that full-time work does not allow for the flexibility to work around periods of incapacitation."  ***Moore v. Colvin*, 743 F. 3d 1118, 1126 (7th Cir. 2014)**.  See also, ***Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013)**, noting that, while it is appropriate to consider daily activities when evaluating credibility, "this must be done with care."

In sum, the reasons the ALJ gave for disbelieving Mr. Bryant are either contradicted by the record or illogical.   The credibility determination was erroneous and requires remand.   "An erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding."  ***Pierce v.***

*Colvin*, **739 F.3d 1046, 1051 (7ᵗʰ Cir. 2014).**   Here, the ALJ considered plaintiff's credibility to be a "major issue."

It is not necessary to address plaintiff's other points, but, as in *Pierce*, the determination of the weight to be given to Dr. Kovalsky's opinion and of plaintiff's RFC will require "a fresh look" after reconsideration of Mr. Bryant's credibility. *Ibid.*

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Mr. Bryant is disabled or that he should be awarded benefits.   On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Thomas J. Bryant's application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   April 17, 2014.**

**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**

19